STATE v. CHARLES NELSON and Another.[1]

December 23, 1903.

Nos. 12,764—(18).

**New Trial.**

New trials in criminal cases should be granted only where the substantial rights of the accused have been so violated as to make it reasonably clear that a fair trial was not had.

**Change of Venue.**

Whether a change of venue should be granted on the ground that a fair and impartial trial cannot be had in the county where the crime is alleged to have been committed, rests in the sound judgment and discretion of the trial court.

**Custody of Jury.**

It is also discretionary with the trial court whether in capital cases the jury selected to try the case should be committed to the care of the sheriff and not permitted to separate during the trial.

**Privileged Communication not Material.**

Three persons were jointly indicted for murder; one of them confessed that the three were guilty, and was called as a witness on behalf of the state at the trial of his codefendants. Prior to the trial he employed an attorney to defend him, to whom he sent a letter containing, as alleged by his codefendants, statements concerning the commission of the crime. His codefendants called the attorney as a witness on the trial, and demanded that he produce the letter. The court ruled that it was a privileged communication, and refused to require the attorney to produce it. The contents of the letter were not disclosed to the court, nor did counsel for the other defendants show or claim that it contained statements material to the case. It is *held* that, whether by confessing to the crime, and testifying on behalf of the state, the privileged character of the communication was waived or not, the ruling of the court was not error for which a new trial should be granted, because it does not appear that the statements contained in the letter were at all material to the issues in the case.

**Prosecuting Attorney.**

Certain remarks by the county attorney during the progress of the trial and in his argument to the jury *held* not prejudicial to defendants or ground for a new trial.

[1] Reported in 97 N. W. 652.

**Charge to Jury—Degree of Crime.**

Where there is no doubt as to the degree of the crime of which the person on trial is guilty, if guilty at all, and no evidence to justify a verdict of any less degree than the one charged in the indictment, the court may so instruct the jury, and charge them that they must either convict of the crime charged or acquit defendant.

**Newly Discovered Evidence.**

A new trial on the ground of newly discovered evidence should be granted only where it is reasonably clear that the new evidence would be likely to change the result, and, in any case, it is discretionary with the trial court whether to grant a new trial on that ground.

**Evidence.**

Evidence examined, and *held* to sustain the verdict of the jury.

Appeal by defendants from an order of the district court for Steele county, Buckham, J., denying a motion for a new trial, after a trial and conviction of the crime of murder in the first degree. Affirmed.

*Samuel Lord* and *Harlan E. Leach,* for appellants.

*W. B. Douglas,* Attorney General, *S. T. Littleton,* County Attorney, and *W. F. Sawyer,* for the State.

BROWN, J.[2]

Charles and Henry Nelson and William Sutton were jointly indicted by the grand jury of Steele county of the crime of murder in the first degree, being thereby charged with having feloniously and with premeditated design killed one Henry Krier in that county on April 13, 1903. Sutton pleaded guilty to murder in the second degree, and was sentenced to imprisonment for life. Defendants Nelson pleaded not guilty, were thereafter tried and found guilty of murder in the first degree, and appealed from an order denying their motion for a new trial.

New trials in criminal prosecutions have for many years been granted by the courts with too much liberality (3 Columbia Law Rev. 433); and to such an extent have the technical rights of accused persons been magnified and upheld, and that, too, in cases where guilt has been overwhelmingly shown, as to result in much public discontent, and to bring the administration of the criminal laws into disrepute. Errors of no

[2]START, C. J., absent, sick, took no part.

vital consequence, at least not affecting materially the substantial rights of the accused, either in the admission or exclusion of evidence, in the instructions of the trial court to the jury, or alleged misconduct of the prosecuting attorney, have opened prison doors and liberated many criminals. This condition has caused peaceful and law-abiding citizens to become lawless, and to join in the barbarous method of punishing crime by a resort to the court of Judge Lynch. All such outrages of the law have been attributed in the main to the lax administration of the laws in the criminal courts, the gravity and tenacity with which they respect the alleged legal rights of the criminal, and the unnecessarily strict adherence to ancient forms and procedure. Remedies have been suggested, among others that the right of appeal be taken away in such cases, but it is believed that the only appropriate way to quiet the public mind in this respect, and restore confidence in the ability of the courts to administer justice, not only to the criminal, but to society and the state as well, and to overcome the tendency to resort to lynch law, is a prompt and speedy trial, conviction, and certain and unrelenting punishment of the guilty, unaccompanied by the long delays usually incident to the administration of criminal laws, and unaccompanied, too, by too much respect for refined and subtle technicalities. . New trials should be granted only where the substantial rights of the accused have been so violated as to make it reasonably clear that a fair trial was not had.

In all cases removed to the highest court for review, the evidence, when returned on the appeal, should first be looked to for the purpose of determining the guilt or innocence of defendant. If there be no doubt of his guilt, alleged errors not affecting his substantial or constitutional rights should be brushed aside, and in their place substituted the almighty force and power of truth. The conviction of an innocent person is far too remote a probability to justify an application of the technical rules of law so necessary in olden times, when persons were not surrounded by the same constitutional and statutory safeguards as at the present day. The safeguards thrown around accused persons are not intended as a means to enable the criminal to effect an escape from the punishment his crime calls for, but to protect the innocent and secure to all a fair, impartial, and orderly trial on definite lines of procedure. The Supreme Court of Michigan has taken an ad-

vanced and commendable position on this subject, and one that might well be followed and applied by other courts. It is elementary that a trial court cannot instruct a jury to return a verdict of guilty in a criminal prosecution. Yet the Supreme Court of that state held that, though such an instruction was given to a jury and acted upon by them in the verdict of guilty returned, the action of the court was not prejudicial error, for the uncontroverted evidence in the case showed the guilt of the defendant beyond any doubt. People v. Neumann, 85 Mich. 98, 48 N. W. 290, and other Michigan cases cited in the opinion. The guilt of the person accused in that case, and in the others cited by the court, was given special and prominent significance in determining the sufficiency and merit of the errors relied upon by the defendant for a reversal.

In the light of these observations, not intended as a criticism of any particular court, but rather of general conditions respecting the administration of the criminal laws, we shall consider the errors relied upon by defendants in the case at bar. Our examination of the evidence leaves no doubt in our minds as to their guilt, and we are not in the least hampered by the thought that perhaps they are innocent. The evidence will be discussed briefly further along, and the alleged errors in law disposed of first.

1. The crime for which defendants were tried and convicted was committed near the city of Owatonna, in Steele county. At the time, and for some subsequent period, it created considerable excitement, was generally discussed by the people and in the newspapers, and all law-abiding citizens were highly incensed and wrought up over the affair, it being a particularly cold-blooded murder for the purpose of robbery. Before the trial of the action commenced, defendants Nelson moved the court for a change of venue on the ground that, as the people of Steele county were prejudiced and biased against them, it would be impossible to obtain a fair jury or have an impartial trial therein. The court denied the motion, and the order denying it is assigned as error.

An order changing the venue in criminal cases is one resting largely in the sound judgment and discretion of the trial court. While every person accused of crime is guarantied by the Constitution and laws of the state a fair and impartial trial, and where such cannot be had in the county where the offense was committed, it is the duty of the

trial court to order a change of venue to a county where such trial can be had, yet whether in any case a change of venue should be granted rests in its discretion. State v. Stokely, 16 Minn. 249 (282). The showing made in support of the motion in the case at bar was quite strong, but we are not prepared to say that the court abused its discretion in denying the motion. That defendants had a fair and impartial trial as a matter of fact, whatever doubts they may have had of their ability to obtain it in Steele county, appears to us clear. They were by consent given forty peremptory challenges at the trial, but in obtaining the jury which finally passed upon their guilt or innocence they exercised but ten, showing that, whatever public excitement there may have been concerning the case, there was not such prejudice against defendants, or opinion on the merits of the case, as to render it at all difficult to obtain a fair and impartial jury.

2. At the opening of the trial defendants requested, in view of the alleged public feeling at Owatonna, the place of holding the trial, that the jury be kept in charge of the sheriff and not permitted to separate. The court denied the request, and this order, also, is assigned as error. The question has frequently been before us, and we have uniformly held that it is a matter purely discretionary with the trial court whether to confine the jury or permit them to separate during the trial. No reason is presented in the record in this case to justify us in holding that the court abused its discretion. State v. Bilansky, 3 Minn. 169 (246); State v. Ryan, 13 Minn. 343 (370).

3. It appeared during the trial of the action that, after defendants had been arrested and confined in jail, defendant Sutton retained an attorney to defend him, or otherwise protect his rights and interests in the prosecution to be brought against him, between whom certain communications were had, both oral and written, concerning the commission of the crime. At the trial the attorney was called as a witness, and upon cross-examination by defendant's attorney was asked whether he had not received a written communication from Sutton concerning the commission of the crime, and, upon answering that he had, he was asked to produce it. The attorney claimed that the communication was privileged; and it was objected that he could be required neither to produce it nor to testify regarding its contents, because it was received by him in the course of his professional employment as

attorney for Sutton, and was a privileged communication. The court sustained him, and the ruling is assigned as error.

Our statutes provide (G. S. 1894, § 5662, subd. 2) that an attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon, in the course of his professional employment. It is the sworn duty of an attorney at all times to maintain inviolate the confidence reposed in him by his client, and at every peril preserve his client's secret. If in a case like this the privileged character of the communication to the attorney does not attach because of the fact that Sutton confessed and testified on the trial as a witness for the state concerning the commission of the crime, and the statute does not apply, and if it be conceded that the ruling of the court on this subject was erroneous, it is quite clear that it is not shown that the error was prejudicial to the rights of defendants. It affirmatively appears that they were afforded ample opportunity to inquire as to the contents of the letter. At the suggestion of the court, after holding that the letter was privileged, Sutton was called by defendants and interrogated concerning the letter and its contents, and in response to most of the questions stated that he did not remember what it contained. A proper foundation for impeachment was thus laid (Dunnell's Trial Book, 317), but defendants did not thereafter ask to have the letter produced.

Again, and a stronger reason, we are not informed by the record as to the contents of the letter, and it would be going far beyond any case to which our attention has been called to order a new trial for the purpose of admitting the letter in evidence, without knowing that its contents were at all material to the issues. If counsel knew the contents of the letter, they did not disclose their knowledge to the trial court. They now say that they in fact knew the contents of the letter, and could have informed the court "had there been any occasion to do so." Such an occasion was presented on the trial, should have been acted upon, and counsel are in no position now to ask this court to proceed in the dark, and grant a new trial for the exclusion of evidence, the evidentiary effect or nature of which is not shown. Upon the whole, we are clear that a new trial should not be granted on this ground.

4. It is contended that the county attorney, in the course of the trial of the action, was guilty of misconduct prejudicial to defendants and

justifying a new trial. Misgen, who was called and examined as a witness on the part of the state, testified that he was a passenger on a train which passed the scene of the murder soon after its occurrence, and that he saw three persons standing facing the train on the hill at a distance of about fifteen rods from the place of the crime, and thought he recognized them as defendants and Sutton. He did not know at the time of the commission of the crime, for it had but recently been committed. But on cross-examination he was interrogated by defendants' attorney whether he had disclosed at any time prior to the trial the fact that he then recognized the three defendants, whereupon the county attorney stated,

> "He told me about it the next day." To which remark defendants' counsel excepted, in response to which objection the court said, "You ought not to have said that, Mr. Littleton." The county attorney then asked the witness, "Did you communicate the fact you knew they were there to me as county attorney?" To which the witness answered, "I did."

It is contended by counsel for defendants that the statement of the county attorney just quoted was prejudicial error, for which a new trial should be granted. While the remark of the county attorney was improper, we do not think, in view of the fact that he was rebuked by the court for making it, and the further fact that the witness immediately testified in corroboration of the remark, namely, that he had in fact communicated the particular information to the county attorney, that the error is of sufficient consequence upon which to base a reversal of the case.

During the course of his argument to the jury in summing up the evidence, and while discussing the probable truthfulness of witness Sutton, upon whose evidence and confession the state mainly relied for conviction, and referring to the time when the confession was made at the county jail in Minneapolis, the county attorney said:

> "He broke down and cried as he would cry upon the bosom of his mother, and confessed."

The remark was excepted to by defendants' attorney, but the court did not interfere, either by way of rebuking the attorney or directing

the jury to disregard it. It is contended in this court that the statement was prejudicial to the rights of defendants, and reversible error. We do not concur in this contention. Much latitude must necessarily be allowed attorneys in summing up to the jury, and an unreasonably strict rule limiting discussion to the immediate points in evidence should not be established. The remark was not pertinent to any evidence in the case, and out of place, but it was at most a mere flight of oratory, and of no special significance. The failure of the trial judge to notice the remark at the time it was made impresses us that it was then regarded by him as unimportant, of no consequence, and in no way prejudicial to the rights of the defendants.

5. The court charged the jury that they must find defendants guilty of murder in the first degree, or acquit them; and it is urged that this was error. The language of the court in this respect was:

> "Now, I say to you what I believe is the understanding of counsel on both sides, and what is certainly the law of the case, that you must find these defendants guilty of murder in the first degree, or you must acquit them. There is no claim that these men are guilty in any other way than under the circumstances set forth by the witness Sutton, who was indicted jointly with the defendants whom you are trying."

We find no error in this instruction. The defendants were charged with the crime of murder in the first degree, and their defense was, not that they killed deceased and were in any way justified or excusable, or that it was the result of a quarrel or fight in which the plea of self-defense would have been available, but that they were not guilty, that they were not the perpetrators of the crime; and the case made by the evidence is clearly that defendants were guilty of the crime charged against them, or they were innocent. There was no occasion for submitting to the jury the lesser degrees of the crime of murder or manslaughter, because there was not a fact or circumstance in the case to warrant a verdict of anything lower than murder in the first degree. This rule is fairly well settled in this state, as well settled in fact as any rule can be, that in any case where there is no doubt as to the degree of the crime of which the person on trial is guilty, and no evidence justifying a verdict of any lesser degree than the one charged in the indict-

ment, the court may so instruct the jury, and inform them that it is their duty to convict of the crime charged, or acquit. State v. Cantieny, 34 Minn. 1, 24 N. W. 458; State v. Rheams, 34 Minn. 18, 24 N. W. 302; State v. Hanley, 34 Minn. 430, 26 N. W. 397; State v. Lentz, 45 Minn. 177, 47 N. W. 720.

6. It is urged with great earnestness on the part of counsel for defendants that the verdict of the jury is not justified by the evidence. To this assignment of error we now turn our attention.

Defendants and Sutton resided at Owatonna on the day the crime charged against them was committed, and had resided there for a considerable time prior to that date. Charles Nelson was eighteen years old on December 26, 1902, his brother Henry was sixteen on August 26, 1902, and Sutton was about the same age. Instead of living at home with their parents, the boys rented a room in the central part of the city, where they spent most of their time. The deceased, Krier, was a saloon keeper doing business at Owatonna, his place of business being rented of one Glaeser, who lived on the outskirts, and about a mile and a quarter from the center of the city. The boys frequented this saloon, particularly Sutton, and were well acquainted with the proprietor, Krier.

Upon the day in question Krier was indebted to Glaeser, his landlord, in the sum of $75, rent due for the premises occupied by him in his business. He determined to take that amount of money and go to the residence of Glaeser and pay him. He talked about the matter in his saloon when Sutton was present, and the latter overheard the conversation. The first mention of the subject in the presence of Sutton was in the saloon between eleven and twelve o'clock in the forenoon. Subsequently Sutton communicated to the Nelson boys the fact that Krier intended to go to Glaeser's for the purpose of paying the rent, and it is claimed that they then agreed among themselves to rob him on his way out; that preparations were then made to commit the act, cartridges were purchased by one of the Nelson boys for a revolver they owned, and other details agreed upon. Sutton again appeared at the saloon in the afternoon of the same day, and was present when Krier took the money from his safe preparatory to starting for Glaeser's, and knew that he took out $76—$75 for rent, and $1 extra, as Krier remarked when he took it out, "in case he needed it." Sutton then

immediately left the saloon, and he in company with the Nelson boys were seen going at times on a run, and at other times on a rapid walk, in the direction of Glaeser's house; and they were seen by one witness, who resided not far from the scene of the commission of the crime, a short time prior going in that direction.

Krier left his place of business about four o'clock in the afternoon, and the boys had preceded him, going in the same direction he would be required to go to reach Glaeser's. He inquired of some one familiar with the road as to its condition, and was informed, and this too in the presence of Sutton, that the road was practically impassable owing to its wet and muddy condition; and he was told that the best way to reach Glaeser's would be by the Milwaukee railroad track. He left the saloon, as stated, in the neighborhood of four o'clock in the afternoon, carrying with him a bundle containing some bottles of beer and wine. He proceeded by way of the railroad track to a point where he could conveniently cross a pasture and reach Glaeser's without passing along the muddy highway. Soon after leaving the track he was met by the three defendants, who had concealed themselves in some woods or brush between the railroad track and Glaeser's. They assaulted him and undertook to take from him his money. He struggled away from them and started on a run to retrace his steps towards the railroad track, and, just as he reached the wire fence along the right of way, one of the Nelson boys seized him by the throat, and the other shot him in the head with a revolver, killing him instantly. Defendants and Sutton then rifled his pockets of his money, divided it among them, and some time thereafter returned to town.

Krier was missed from his place of business, not returning when he was expected, and late in the night search was made for him on the supposition that some accident had befallen him, when his body was found about two o'clock in the morning where he had been shot and killed by defendants. Considerable excitement existed at Owatonna the next morning and the entire day, and very earnest efforts were made to locate the guilty parties. The defendants remained about town during the entire day, but the next morning made their escape, walking as far as Faribault, then by train to Mendota, from there on foot to St. Paul, and by street car to Minneapolis, where they were arrested upon leaving the car, and taken into custody. While in jail at Minneapolis,

Sutton confessed. Evidently his courage left him, and he made a full detailed confession of the crime, stating how it was planned and executed.

The state, on the trial, relied very largely upon the testimony of Sutton for conviction. He was indicted jointly with these defendants, pleaded guilty to murder in the second degree, and was sentenced to life imprisonment, but was called as a witness by the state in support of the prosecution against his codefendants. He was an accomplice, and of course it was necessary that he be corroborated; unless corroborated, conviction on his testimony alone could not stand. Our examination of the record discloses corroboration in every essential item of his testimony. He detailed very fully to the jury the facts we have outlined above, and there is ample corroboration, though he made on and off the stand contradictory and conflicting statements. Taken as a whole, however, his confession and statements point unequivocally to the guilt of defendants of the crime charged against them. He testified that he was in the saloon at the time, and overheard Krier say that he intended to go to Glaeser's to pay his rent. He was corroborated in that by a witness who was present at the time, and testified that Sutton was also present. He testified that one of the Nelson boys bought a box of cartridges on the day in question, and after the three had planned to rob Krier. He was corroborated in this by the dealer, who testified that one of the Nelson boys did on that day buy a box of cartridges from him. He testified that he saw Krier take the money from the drawer just prior to starting for Glaeser's. He was corroborated in this by a witness who testified that Sutton was present in the saloon at that time. In his testimony that the three preceded Krier in the direction of Glaeser's, he was corroborated by numerous witnesses who saw them go. The crime was probably committed about half past four o'clock in the afternoon. He was corroborated in his statement that soon after the crime had been committed he, with the two Nelson boys, was standing in the pasture about fifteen rods from the railroad track, where they were seen by the sheriff of the county, who was a passenger on the train going north that day. The sheriff testified that he saw three persons about that distance from the track, whom he thought at the time were the Nelson boys and Sutton.

At the time the body of Krier was discovered two revolvers were

found near it, one of which was identified as belonging to one of the Nelson boys, and the bullet taken from deceased's head corresponded in caliber to that of the revolver. He was corroborated also by the witnesses Christina Jesperson and Anna Slingsog. These two girls, who seem to have been quite friendly and intimate with defendants, testified that late in the evening of the day of the homicide the defendants and Sutton confessed to them that they had killed Krier, and that his body was near the railroad track some distance out of town. These girls, with the two Nelson boys, about half past seven o'clock that evening went out to where the body lay, and they testified that the pockets were again examined by defendants, and a charm on his watch chain removed, which they lost soon after in the darkness. School children, who a day or so after this were picking flowers in the neighborhood, found the charm at about the place the girls had testified to having lost it. The watch was not taken, because Krier's name was upon it.

Sutton was corroborated in various other particulars; it is unnecessary to point them out. It is sufficient to say that the corroboration was ample and meets every requirement of the law. While there may be some inconsistencies in the different stories told by him and the Jesperson and Slingsog girls, those discrepancies and differences were questions for the jury to reconcile and pass upon. This they did, returning a verdict of guilty, and their action has been approved by the learned trial court. While the defendants claimed and testified that they were not in any way implicated in the crime, that they were at the home of their parents at the time it was committed, the evidence against them is overwhelming, and leaves no room for serious doubt as to their guilt. The fact that they fled from Owatonna soon after the commission of the crime, when they knew that vigorous efforts were being made to locate the guilty parties, is a very strong item of evidence against them.

7. It is urged that the court should have granted a new trial on the ground of newly discovered evidence. The newly discovered evidence is shown by numerous affidavits of different parties, but it is not of such a nature as to warrant this court in declaring the denial of the motion by the trial court an abuse of discretion. The principal new evidence relied upon in this connection is that of two boys who were

seen near the place of the murder by the engineer of the train on the Milwaukee road which passed the scene soon after the crime had been committed. The engineer testified that his train was about an hour late, and passed the scene of the murder about five o'clock. He observed the body of Krier near the right of way fence, and at a distance of about ten rods therefrom he noticed two boys near the right of way, who he thought were schoolboys. He motioned to them, and pointed back to the body of Krier as his train passed rapidly by. The boys were not produced at the trial as witnesses. They were subsequently discovered by defendants' counsel, and made affidavits of the fact that they were there, and fully corroborated the engineer. They noticed the body of Krier, but supposed he was some intoxicated person, and paid no attention to him, but went on their way home.

The sheriff was a passenger on this same train, going to Faribault, and he testified, as we have already mentioned, that as the train passed the scene of the crime—he did not then know the crime had been committed—he saw three persons over in the pasture on the same side of the track with the two boys, who he believed were defendants and Sutton. The two boys not having been produced at the trial may have created some doubt or confusion as to whether the engineer and sheriff saw the same persons. If a new trial were had, the testimony of the boys would simply corroborate the engineer upon an immaterial matter, and tend in no way to contradict or impair the testimony given by the sheriff or of Sutton. The latter testified that he saw the engineer wave his hand and point toward the body of Krier, and the new evidence would in no way contradict him. He was at the time, according to the testimony of the sheriff, but fifteen rods away, and in plain sight of the train.

A motion for a new trial based upon the ground of newly discovered evidence is addressed to the sound discretion of the trial court, with the exercise of which this court will never interfere except in the case of plain abuse, and the rule applies in criminal as well as in civil actions. One of the controlling inquiries in determining whether a new trial should be granted on this ground is whether the new evidence, if produced, will be likely to change the result; and unless it has a substantial tendency towards showing the innocence of defendants, a new trial should not be granted. For the reason that the newly discovered

evidence—that of the two boys—tends only to corroborate the engineer, and that disclosed by the other affidavits is either cumulative or contradictory of other evidence in the case, the trial court properly refused a new trial on this ground. Austin v. Northern Pacific R. Co., 34 Minn. 351, 25 N. W. 798; Mueller v. Grand Grove, 72 Minn. 70, 74 N. W. 1025; Lampsen v. Brander, 28 Minn. 526, 11 N. W. 94; Hilliard, New Tr., 505. It may have been the theory of counsel on the trial that the persons seen by the engineer and those seen by the sheriff were the same, but a new trial should not be granted merely for the purpose of introducing new evidence exploding a theory of counsel.

There are some conflicts in the evidence, but they were for the jury to reconcile; and it was for the jury to determine whether any particular witness swore falsely, or drew too heavily upon his imagination. The trial court has, after due reflection, approved their action, and we cannot interfere. The well-known character and high standing of the trial judge refutes the suggestion that the trial was not calm and deliberate, or that every question presented was not fully and carefully considered.

Order affirmed.


LEWIS, J. (dissenting).

I do not accept the introductory declarations of the opinion as an expression of my views upon the enforcement of the criminal law by the courts of this state. I am not aware of any such abuse of the judicial function as to call for any such expressions from this court. People v. Neumann, 85 Mich. 98, 48 N. W. 290—referred to in the opinion as authority for the statement that the Supreme Court of Michigan has taken an advanced and commendable position in denying a new trial when it appeared from the record that the accused was unquestionably guilty—when examined, discloses the fact that the evidence of guilt was uncontradicted, and in the opinion the court say: "Whenever there is no question of intent in a criminal case, and no inferences, about which reasonable men might differ, to be drawn from the facts, and where, upon the admitted facts, the only question to be determined is whether under the law the statute has been violated, the trial judge may, with perfect propriety, state to the jury that the law applied to the facts, which are undisputed, shows the defendant to be guilty of the

offense charged, and that it is their duty so to find under the facts and the law." And again: "Where a judge has directed a verdict of guilty, and the jury have followed such direction, and the facts are admitted or undisputed, and the only question is one of law applied to such facts, a new trial will not be granted if the judge was right in his application of the law. No injustice can be done the accused in such case, as it is not to be presumed that a jury will find in opposition to the law from mere whim, caprice, or prejudice, although they may have the right to do so."

While concurring in the views of the majority upon most of the errors assigned and discussed, I have very decided views that a new trial should be granted upon the whole case, and especially upon the ground of newly discovered evidence.

The court committed error in holding that the letter written by Sutton to his attorney was a confidential communication. It is the well-settled rule that when an accomplice makes himself a witness for the state he may be required to give a full and complete statement of all that he and his associates may have done or said relative to the crime, and it is also the rule that in such case the privilege is that of the client, and not of the attorney. People v. Gallagher, 75 Mich. 512, 42 N. W. 1063; Jones v. State, 65 Miss. 179, 3 South. 379. But during the subsequent examination the contents of the letter were disclosed to such an extent that defendants could not have been prejudiced by the failure to produce the letter, and I think the error was cured.

I have very grave doubt as to the effect which may have been produced by the remark of the county attorney during his address to the jury, viz., "He broke down and cried as he would cry upon the bosom of his mother, and confessed." This remark was made while the county attorney was discussing the evidence, and remarking upon the probable truthfulness of Sutton's communication, upon which the state largely relied for a conviction. The language cannot be excused upon the ground that it was a flight of oratory, and of no special significance. It was a direct and positive declaration of fact, entirely outside of the evidence in the case, and which, if true, would have great bearing upon the credibility to be attached to the communication. In Martin v. Courtney, 81 Minn. 112, 83 N. W. 503, the attorney was called to account for criticising a decision of this court, and in Fisher

v. Weinholzer, supra, page 22, a new trial was granted because the attorney went outside the record to comment upon the character of the defendant. Should a more liberal rule be adopted in criminal cases where human life is at stake?

A new trial should have been granted in this case upon the ground of newly discovered evidence. The murder took place at about 4.45 o'clock p. m., which time is definitely fixed by the fact that the passenger train was exactly one hour late, its schedule time being 3.45. In order to corroborate the statement of Sutton that defendants committed the murder at about that time, and that they were in the immediate locality when the passenger train went by, the state introduced as a witness the engineer, who testified that he noticed the dead body lying against the fence on the right-hand side of the right of way, and that about ten rods farther on he saw two boys standing facing the train outside of the right of way; that he waived his hand and pointed back to the body; that he saw nobody else in the vicinity. The state also introduced as a witness the sheriff, Misgen, who testified that he was in one of the passenger coaches of the same train; that at a point about fifteen rods beyond the place where the body lay, as afterwards pointed out to him, he saw three boys standing on the hill, facing the train, and says that it flashed through his mind then that they were defendants and Sutton; and at the trial he testified that he recognized them. At one time Misgen stated that the boys were standing still facing the train, and at another time he said he saw them going up the hill.

The only object the state had, or could have had, in introducing the testimony of the engineer, was to corroborate the sheriff's testimony, and the testimony of both to corroborate the statement of the witness Sutton that defendants committed the murder and were immediately thereafter in that locality. According to the affidavits of the Lindersmith boys, they were from ten to fifteen rods beyond the place where the body was, on the same side of the railroad, and stood facing the train as it went by, saw the engineer wave his hand and point back to the body, and saw nobody else in the vicinity, and for the purposes of this motion and case it must be conceded that they were there; in fact, the state does concede it. Only one of two propositions can be true: Either the sheriff was mistaken as to the identity of the parties he saw, and did not in fact see the Nelsons and Sutton, but the Linder-

smith boys; or there were two sets of boys in the immediate neighborhood—the Lindersmiths, seen by the engineer, and the Nelsons and Sutton by the sheriff. Here is a new, clear, and distinct element of fact introduced into the case, going directly and positively to one of the material features relied upon by the state to carry conviction, viz., were defendants there at all at that time? Can it be brushed aside with the remark that it has no bearing upon the case, or that it was a mere theory of counsel? In view of the new evidence, the jury should be permitted to pass upon all evidence touching upon the point at issue, viz., were defendants in the locality claimed by the state at the time mentioned?

The main witnesses relied upon to corroborate Sutton were the two girls, Jesperson and Slingsog, and yet they made contradictory statements and affidavits both before and after the trial, in which they positively denied everything they had said or done directly implicating the Nelsons with the crime, and Sutton stated positively to Warden Wolfer at the State Prison that he falsely testified, and that defendants had no connection with the crime, and also wrote a letter to that effect when in jail at Waseca awaiting trial. While he made a confession, he repudiated it. There was evidence tending to show that defendants were in another part of the city at the time the murder occurred, and there is no other positive testimony or evidence than that already referred to to show that they were at the scene of the murder. Defendants remained in Owatonna the entire day after the murder, were seen by the officers and not arrested, and there was nothing to cast suspicion upon them until they left the city and appeared in Minneapolis, where they were arrested. The corroborating evidence is to the effect that Sutton was familiar with the saloon, and was there at the time Krier departed to visit his landlord; but there is nothing to connect the defendants with such knowledge except as testified to by Sutton. It is true that one of the Nelsons purchased a box of cartridges, that one of them had a revolver into which they fitted, and that a similar cartridge taken out of Krier's body also fitted the revolver; and this was corroborating evidence, but it was not conclusive. The finding of the charm is also of weight, but not overwhelming. A cause was given for defendants leaving Owatonna; no money was found upon their persons; Sutton repeatedly falsified; the two girls were ready to

testify on one side or the other, according to which was exercising influence over them; defendants steadily denied their guilt; and there was some evidence tending to show that other parties were implicated.

After reading all of the affidavits bearing upon newly discovered evidence, and the conflicting and contradictory statements of the witnesses Slingsog and Jesperson, and the inconsistent statements and communications of the main witness for the state, the accomplice Sutton, and from a full consideration of all of the evidence, I am strongly impressed with the fact that the trial of this case was not prosecuted by the county attorney with that degree of fairness which should attend judicial investigations of such grave importance. I am not prepared to say that a new trial should be granted upon the ground alone that the prosecuting attorney was guilty of misconduct, or upon the ground of prejudice, or newly discovered evidence outside of the evidence furnished by the Lindersmiths; yet in view of the contradictory state of the evidence, the want of positive, unequivocal proof in all respects tending to show their guilt, a new trial should be granted in order that there may be obtained a calm, deliberate investigation of all the complicated facts in view of the new light to be thrown upon the controversy. The public would lose nothing by such investigation. It is better far that the delay and the expense attending it be assumed, even though quite burdensome, than that there should remain any reasonable doubt that the correct result was reached. An interesting case upon this subject is Dennis v. State, 103 Ind. 142, 2 N. E. 349, where the Supreme Court held that the trial court had abused its discretion in refusing to grant a new trial upon the ground that the state's witness, an accomplice, had subsequent to the trial made a so-called "third" confession, which materially changed the evidence given by him upon the trial.