STATE, Respondent, v. SYVERSON, Appellant.

(166 N. W. 157.)

(File No. 3948.    Opinion filed January 18, 1918.)

1.  Banks and Banking—Receiving Deposits—"Insolvency," Value of Assets, Meeting Creditor Demands, Bank Reserve, As Test—Statute, Civil and Criminal Aspects of.

    The term "insolvency," as used in Laws 1909, Ch. 222, Art. 2, Sec. 45, providing that if any banker, president, etc., of any bank doing business in this state, shall receive, etc., any deposit of money, etc., after having knowledge that such bank is insolvent, is guilty of a felony, means actual insolvency; and a conviction thereunder could not be sustained when based alone on statutory or constructive insolvency as mentioned in Sec. 46, providing that a bank shall be deemed insolvent (2) when unable to meet demands of creditors in the usual and customary manner, and (3) when it fails (under Sec. 27) to make good its lawful reserve; said sections serving a twofold purpose, one civil or administrative, the other penal or criminal in nature; and constructive insolvency as mentioned in said clauses of Sec. 46, thereof following charge of actual insolvency would constitute legal ground for public examiner to take possession of the bank and liquidate its affairs. Criminal liability for receiving deposits knowing the bank to be insolvent, can only be based on actual insolvency as defined by first clause of Sec. 46, viz., when actual cash market value of its assets is insufficient to pay liabilities; being the general

instead of the limited statutory meaning of the term "insolvency."

2.  **Same—Insolvent, Receiving Deposits—Actual Insolvency, Inability to Meet Demands, Failing Re Cash Reserve, As Evidence of.**

Evidence that a bank was unable to meet demands of creditors in the usual and customary manner, and that it failed to make good its cash reserve, was competent and material as circumstances proper to be considered in connection with other evidence, in determining whether actual insolvency existed.

3.  **Criminal Law—Insolvent Bank, Receiving Deposits—Evidence of Failure to Meet Demands, to Keep Reserve, Regardless of Assets Relations—Instruction.**

In a criminal prosecution against a bank president, under Laws 1909, Ch. 222, for receiving a deposit after knowing the bank was insolvent, held, that an instruction that defendant might be convicted if jury believed beyond reasonable doubt that the bank failed to meet demands of creditors in the usual and customary manner, or failed to make good its lawful cash reserve, regardless of whether the actual cash market value of its assets was insufficient to pay liabilities, while erroneous, and if the evidence on question of actual insolvency were such that different minds might reasonably differ as to whether said bank was insolvent, would be prejudicial, yet, the evidence and instructions disclosed of record being such that no other conclusion, within bounds of reason, could have been drawn from the evidence than that the bank was actually insolvent to defendant's knowledge, the instruction was not prejudicial error.

4.  **Banks and Banking—Insolvent, Receiving Deposit—Evidence of Actual Insolvency, Sufficiency.**

In a criminal prosecution against a bank president for receiving a deposit after having knowledge of bank's insolvency; it appearing that, while evidence on many points was sharply conflicting, yet, that the bank apparently had assets of value of about $100,000, while indebtedness was about $89,000; it appearing beyond doubt that at least $30,000 of face value of assets were wholly worthless or not bank assets at all; that about $40,000 of claimed assets was of little or no value, while large portions had become property of third persons, although on the bank books as assets, while other notes had been cancelled though carried as assets, the security on other notes having been exhausted, while makers of other notes were insolvent; the worthless assets and those belonging to others aggregating $30,000; all of which facts must have been known to defendant; held, that said bank was actually insolvent under circumstances conclusively imputing defendant with knowledge thereof.

5. **Appeals—Criminal Prosecution—Overwhelming Evidence of Guilt, Erroneous Instruction, Effect Re Error—Rule Re Reversal.**

Where court can see from the record that evidence is so overwhelmingly against accused that had jury been correctly instructed they must still have found against him, judgment of conviction will not be reversed for error of instruction; and if there be no doubt of defendant's guilt, alleged errors not affecting his substantial or constitutional rights should be brushed aside and substituted by the force and power of truth.

Whiting, P. J., taking no part in the decision.

Appeal from Circuit Court, Kingsbury County. Hon. ALVA E. TAYLOR, Judge.

The defendant, Emil A. Syverson, was convicted of receiving deposits, knowing his bank was insolvent, and he appeals. Affirmed.

See also, 37 S. D. 493, 159 N. W. 40.

*Sherin & Sherin, Warren & Warren* and *Null & Royhl,* for Appellant.

*Clarence C. Caldwell,* Attorney General, *Byron S. Payne,* Assistant Attorney General, *E. F. Green,* State's Attorney, and *A. K. Gardner,* for the State.

(3) To point three of the opinion, Appellant cited:

Ellis v. State, (Wis.) 119 N. W. 1110; Laws 1909, Ch. 222, Secs. 45, 46, 27, 28.

(4) To point four of the opinion, Respondent cited:

3 Ruling Case Law, 494-495; 1 Morse on Banking, § 178.

McCOY, J. [1] The defendant appeals from a judgment convicting him of the offense of receiving a deposit after he had knowledge that the bank of which he was president was insolvent. The information alleged that on the 10th day of November, 1914, defendant unlawfully and feloniously received a certain deposit into said bank then and there having knowledge and knowing that said bank was insolvent. The vital issue tried out was whether or not said bank was insolvent on the 10th day of November, 1914, and, if insolvent, did defendant have knowledge of that fact. Upon many points there was sharp conflict in the evidence, which was quite voluminous, and it would be impracticable and would serve no useful purpose to detail the same in this decision. The information is based upon section 45, art. 2, c. 222, Laws of 1909, the State Banking Act, which

provides that, if any banker, or any president, director, manager, cashier, or other officer of any bank or banking institution doing business in this state, shall receive or assent to the reception of any deposit of money, or other valuable thing, by any such banker, bank, or banking institution after he shall have knowledge of the fact that such bank is insolvent, is guilty of a felony. Section 46 of said article provides that a bank shall be deemed insolvent: (1) When the actual cash market value of its assets is insufficient to pay its liabilities; (2) when it is unable to meet the demands of its creditors in the usual and customary manner; (3) when it shall fail to make good its reserve as required by law. The term "insolvent" is not always used in the same sense, and one of the questions involved in this case is: What is meant by the term "insolvent" as it appears in said section 45. As will be observed, section 46 refers to three kinds of insolvency. The first class referred to is when the actual market cash value of all assets is insufficient to pay all the debts or liabilities. Insolvency in this sense means actual insolvency, and is the statutory definition of general or actual insolvency within this state, regardless of what the definition of general insolvency may be in other jurisdictions. The second class of insolvency referred to in this section is deemed to exist when the bank is unable to meet the demands of its creditors in the usual and customary manner. This is constructive insolvency, made so by statute, and such statutory constructive insolvency may exist although the bank at the same instant might be actually solvent; in other words, a bank might not be able to cash checks of depositors when presented in the usual manner, but still be possessed of and own assets of double or treble the value of all its liabilities. The third class of insolvency referred to in section 46 is deemed to exist when a bank shall fail to make good its reserve as required by law. This is also constructive insolvency, made so by statute, and may exist although the bank might be actually solvent. Section 27 of this banking act provides that every bank shall keep on hand at all times at least 20 per cent. of its total deposits as a cash reserve, and whenever the said reserve of any bank shall fall below the said amount so required to be kept, the public

examiner shall notify any such bank to make good such reserve, and in case the bank fails for 60 days thereafter to make good such reserve, the public examiner is authorized to take charge of and to wind up the affairs of said bank. It is a matter of common knowledge that a banking institution for some reason or other might fail or be unable to keep up or make good said reserve within the time specified by law, but still have ample property, the market value of which would far exceed its total debts and liabilities. On the trial the court instructed the jury:

That in considering the question as to whether or not said bank, on the 10th day of November, 1914, was insolvent, under the first subdivision of the statute, to which he called attention, being section 46, a bank shall be deemed insolvent when the cash market value of its assets is insufficient to pay its liabilities, and "if you shall believe from the evidence beyond a reasonable doubt that on the 10th day of November, 1914, the actual cash market value of the assets of said bank were insufficient to pay its liabilities, then you would be warranted in finding that said bank was at said time insolvent; and if you shall have a reasonable doubt as to whether or not the actual cash market value of the assets of said bank were insufficient to pay its debts on the 10th day of November, 1914, then you should consider the second ground of insolvency, to wit, whether on said date, said bank was unable to meet the demands of its creditors in the usual and customary manner. If you shall believe from the evidence beyond a reasonable doubt that on said date said bank was unable to meet the demands of its creditors in the usual and customary manner, then you would be warranted in finding that on said date the said bank was insolvent, regardless of whether or not the actual cash market value of its assets were insufficient to pay its liabilities; but, on the other hand, if you should entertain a reasonable doubt as to whether or not, on said date, the said bank was unable to meet the demands of its creditors in the usual and customary manner, then you should resolve that doubt in favor of this defendant, and it would then be your duty to consider the third ground of insolvency, to wit, whether the bank had failed to make good its reserve as required by law. You will observe from this provision of the statute that before the

defendant could be held answerable for insolvency under this provision of the law it would be necessary for the public examiner to have notified the bank to make good such reserve, and if you should be satisfied from the evidence beyond a reasonable doubt that 60 days or more prior to the 10th day of November, 1914, the reserve of said bank was below 20 per cent, of its deposits, and that while its reserve was thus below the amount required by law the public examiner notified said bank to make good such reserve, and you further find, beyond a reasonable doubt, that said bank failed for 60 days after the receipt of said notice to make good such reserve, and that said condition continued to and included the 10th day of November, 1914, then you would be warranted in finding that on said last-mentioned date the said bank was insolvent under the third provision of the statute above referred to, regardless of the other two provisions."

To the giving of this instruction the appellant duly excepted. It is the contention of the appellant that the word "insolvent," contained in said section 45 of said banking act, whereby a banker is made guilty of a felony when he receives a deposit knowing said bank to be then and there insolvent, means insolvency in its general and ordinary meaning, and that a conviction under said statute can only be sustained where it appears from the evidence beyond all reasonable doubt that said bank was in fact actually insolvent; that constructive statutory insolvency, which does not constitute actual insolvency, is not sufficient to sustain a conviction under said section 45.

We are of the opinion that the term "insolvency," as used in said section 45, means actual insolvency, and that a conviction under this section could not be sustained when based alone on statutory or constructive insolvency, such as is mentioned in the second and third clauses of said section 46. It will be observed that the provisions of this banking act, in its relation to insolvency, serves a twofold purpose, one civil or administrative, the other penal or criminal, in its nature. In this state, under our code system of laws, criminal offenses are usually defined by the Penal Code, and administrative duties of public officers are defined in the Political Code. In this instance the Legislature

mixed the two general subjects in one act. Constructive insolvency, such as is mentioned in the second and third clauses of section 46, although falling short of actual insolvency, would constitute sufficient legal authority and ground for the public examiner to take possession of the assets and business of a bank so insolvent, and close up and liquidate its affairs as an administrative act under the provisions of this banking statute.

"If those engaged in the banking business are to be held criminally liable for receiving deposits when knowing themselves to be actually solvent, although they have failed to meet the demands of their creditors in the usual and customary manner, or have failed to make good their cash reserve as required by law, then banking certainty would be a very dangerous business in which to engage." Ellis v. State, 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, 131 Am. St. Rep. 1022.

In that case the court said:

"Must the limited meaning be given to the term 'unsafe or insolvent' as used in the statute? Is it true that, under all circumstances, the proprietors of a bank, though believing they have an abundance of assets to pay out within a reasonable time all liabilities to depositors, must close the doors and go into liquidation whenever they have good reason to know they will, or probably may, not be able to pay all demands upon the bank in the usual course of business, and that every moment of time they keep open for business thereafter they are criminals before the law and liable to be prosecuted and punished by long terms of confinement in the state prison? If such is the law, the banking business is exceedingly unattractive, and the more conscientious the banker is, the less attractive it is. It must be seen at once that the statute is open to construction. The words used have the two well-known and widely different meanings. By the familiar rule that, in general, the common ordinary meaning of words in a law is to be taken as the one intended by the Legislature, we must discover some efficient reason for holding that it did not have in mind, in enacting the law in question, the one which the learned trial court rejected. While it is reasoned by some courts that the mischiefs to be guarded against by such legislation suggest the limited meaning as intended, such

reasoning is not satisfactory, and is not in accord with the reasoning of other just as respectable courts holding to the contrary view."

We therefore hold that criminal liability for receiving deposits knowing a bank to be insolvent can only be based on actual insolvency as defined by the first clause of said section 46, being the general instead of the limited statutory meaning of the term "insolvency."

[2] We are also of the view that the evidence that said bank was unable to meet the demands of its creditors in the usual and customary manner, and that it failed to make good its cash reserve, was competent and material as circumstances proper to be taken into consideration, in connection with all the other evidence, in determining whether or not actual insolvency existed, and that error was not committed in the reception of such evidence.

[3] We come now to the question: Was there prejudicial error in the instruction to the jury that the appellant might be convicted, if the jury believed beyond a reasonable doubt that the said bank failed to meet the demands of its creditors in the usual and customary manner, or failed to make good its cash reserve as required by law, regardless of whether the actual cash market value of its assets were insufficient to pay its liabilities? The court first instructed the jury, as will be observed, that if the jury believed from the evidence beyond all reasonable doubt that the actual cash market value of the assets of said bank at the time in question was insufficient to pay its liabilities, then the jury would be warranted in finding that said bank was at said time insolvent. If the evidence in this case on the question of actual insolvency was of such a nature that different minds might reasonably differ as to whether or not said bank at the time in question was insolvent, then we should say that the said instruction was highly prejudicial; but, bearing in mind that the pardoning power in this state is vested in the board of pardons and the Governor, and not in trial juries, and that juries in this jurisdiction are duty bound in criminal cases to determine the issues according to the evidence and instructions of the court, we are of the view, under the evidence and instructions, as disclosed

by the record, that no other conclusion, within the bounds of reason, could have been drawn from the evidence than that said bank was actually insolvent at the date in question, and that appellant then had knowledge thereof. Upon the trial of the cause, from testimony offered by appellant, it appeared that at the time in question the said bank apparently possessed assets of the value of $100,920, consisting of loans and discounts, commercial paper, over-drafts, money due from other banks, cash and cash items, banking house, furniture and fixtures, and other property; that the indebtedness of said bank was then $89,129, leaving an apparent excess of assets over liabilities of about $11,800. It also appeared from the evidence beyond any doubt that at least $30,000 of the apparent face value of the assets as claimed by appellant were either wholly worthless or not assets of the bank at all on the 10th day of November, 1914. In fact, there was then about $40,000 of the inventoried assets, as claimed by appellant, which the evidence overwhelmingly showed was of but little or no value. A large portion of this amount of pretended assets consisted of commercial notes which had been sold and transferred to, and thereby became the property of, third persons, and which notes on said date in question were in the possession of said bank for collection only, and were not then assets of said bank at all, but were then, on the books of said bank, made to appear as assets of said bank. Another portion of said inventoried assets consisted of notes the consideration for which had been canceled and returned to the makers thereof; the notes themselves still being in the possession of the bank and carried on its books as assets. Another portion of said inventoried assets consisted of notes that at some previous time had been secured by mortgages, or other collateral, where the security had been exhausted or applied on such notes, but that such notes were still carried as assets, although the makers thereof were insolvent. There were also other notes carried as assets whose makers were shown to be wholly insolvent at the time in question. It also conclusively appears that on the 10th day of November, 1914, said bank carried fictitious items, inventoried as cash, which in fact did not represent cash or any other thing of value. It overwhelmingly appears that at least $30,000

of said inventoried assets, as claimed by appellant, were not assets at all or of any value whatever, all of which must then have been known to appellant, as he took part in the transactions by which such notes ceased to be the property of the bank; that he received the consideration paid by third parties therefor, and diverted the same to his own use and benefit; and that he also took part in the transactions whereby the consideration and obligation to pay many of said notes became extinguished.

[4]   We are of the view, and so hold, that the overwhelming evidence shows that said bank at the time in question was actually insolvent under circumstances conclusively imputing appellant with knowledge of such actual insolvency.   For these reasons we are of the opinion that the giving of the instructions in question in relation to the failure of said bank to meet the demands of its creditors in the usual and customary manner and in failing to make good its reserve as required by law were not prejudicial, for the reason that under the force and effect of the overwhelming evidence submitted on the trial no other verdict, within the bounds of reason, could have been returned than one of guilty of receiving said deposit then knowing said bank to be actually insolvent.   This position is sustained by the rule as stated in Walker on Errors in Crim. Proceedings, § 59e, as follows:

"Where the court can see from the record that the evidence is so overwhelmingly against the accused that, had the jury been correctly instructed. they must still have found against him, a judgment of conviction will not be reversed for error of instruction."

The following decisions also sustain the same view.   State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Rusk, 123 Minn. 276, 143 N. W. 782; State v. Brand, 124 Minn. 408, 145 N. W. 39; People v. Neumann, 85 Mich. 98, 48 N. W. 290; Hoge v. People, 117 Ill. 35, 6 N. E. 796; Zimm v. People, 111 Ill. 49. In State v. Nelson the court, among other things, said:

"New trial should be granted only where the substantial rights of the accused have been violated as to make it reasonably clear that a fair trial was not had.   In all cases removed

to the highest court for review, the evidence, when returned on the appeal, should first be looked to for the purpose of determining the guilt or innocence of defendant. If there be no doubt of his guilt, alleged errors not affecting his substantial or constitutional rights should be brushed aside, and in their place substituted the almighty force and power of truth."

[5] This statement of the rule meets with our approval. Of course, this rule does not apply where there is a question of intent in a criminal case to be determined by a jury, or where there are inferences about which reasonable men might differ to be drawn from the facts, or where there is a substantial conflict in the testimony to sustain a conviction.

Many assignments of error are made based upon the reception or rejection of evidence, all of which have been given due consideration. Careful examination of the voluminous record fails to disclose prejudicial error. We are clearly of the view that appellant had a fair trial.

The judgment and order appealed from are affirmed.

WHITING, P. J., took no part in this decision.