# STATE OF NORTH DAKOTA, Respondent, v. L. J. RODMAN, Appellant.

(221 N. W. 25.)

Opinion filed September 24, 1928.

*Fisk, Craven, & Taylor* and *George A. Bangs,* for appellant.

*George F. Shafer,* Attorney General, *E. R. Sinkler,* and *Gustav A. Lake,* State's Attorney, for respondent.

BURR, J. The defendant was indicted by the grand jury of Williams county for the crime of knowingly permitting, conniving, and being accessory to, the acceptance and receiving of money on deposit in an insolvent bank. The indictment had in view the provisions of §§ 5175, 5176 and 5189 of the Compiled Laws of 1913.

When arraigned upon the indictment the defendant moved to have the same set aside on the ground that an unauthorized person was permitted to appear before the grand jury to assist them in the discharge of their duties. The court denied this motion. No demurrer was interposed, and upon the refusal to set aside the indictment the defendant entered his plea of not guilty. Upon trial the defendant was convicted of the crime of knowingly permitting, conniving and being accessory to, the acceptance and receiving of money on deposit in an insolvent bank, knowing said bank to be insolvent as alleged in the indictment. Motion for a new trial was made upon the grounds afterwards urged on this appeal. When the court denied this motion the defendant appealed.

There are 319 specifications of error in the record; 5 volumes—1670 pages—of testimony; 289 exhibits; 2 volumes—432 pages—of appellant's brief; one volume—162 pages—of respondent's brief; and 93 pages of memorandum in reply. The case therefore demanded some reasonable length of time for examination on appeal.

The 319 errors classify as follows: One dealing with the refusal of the court to set aside the indictment; 156 dealing with overruling objections to question; 10 refusals to strike out evidence; 107 in re-

ception of exhibits; 28 in sustaining objections to questions; 2 in striking out evidence; 8 alleged errors in instructions to the jury; and 7 errors alleged in denying requests for instructions.

The defendant arranges his brief under sixteen heads; the first dealing with the indictment; second and eighth with the general allegations of the insufficiency of the testimony; third, with the charge of the court regarding insolvency; fourth, fifth, ninth, tenth, eleventh, twelfth, with the admission of exhibits; 12, 51, 53 B-C-D, 286, 55 A-B-D, 58 A-B-C, 59 C-D, 62 B, 54 A, 22, 24, 6, 11 A, 11 JK, 11 AS, 11 AT, 11 AU, 11 AV, 11 AZ, 11 BE and 11 BF; seventh with the testimony tending to establish commission of other offenses; sixth, thirteenth, fourteenth, fifteenth and sixteenth, with the testimony of witnesses Murphy, Van Sickle, and Blegen.

At the outset of the case we are confronted with a motion to dismiss the appeal on the ground that it is taken too late. The defendant was convicted on the 11th day of December, 1924, and judgment of conviction was entered that day. The notice of appeal was not served until the 27th day of November, 1925, and not filed until the 5th day of December, 1925. At the time judgment was entered the defendant had one year in which to appeal to the supreme court. See § 10,994 of the Comp. Laws 1913. Thus his time to appeal would not expire until the 11th day of December, 1925. However, on March 7th, 1925, the legislature amended § 10,994 by limiting the time for appeal to six months from the time judgment was rendered. This statute went into effect the first day of July, 1925. See chap. 125, Sess. Laws 1925. By this time more than six months had expired from the time judgment had been entered and it is the contention of the state the right of appeal was thus automatically cut off. The state argues that as there were no exceptions in this amendatory statute, it therefore applies to all appeals—those pending, as well as those which might be taken after the law went into effect. It is true this chapter is general in its tenor, and applies to appeals from all judgments whether entered before or after it became effective,—that is, judgments entered before July 1st could not be appealed after January 1st of the succeeding year. We have had occasion to construe a very similar statute with reference to civil appeals. In 1913 the time for taking appeals in civil actions was changed from one year to six months. See § 14, chapter 131, Sess.

Laws 1913. The language was as general as is the language of chapter 125, Sess. Laws 1925. This court held, in Wilson v. Kryger, 26 N. D. 77, 51 L.R.A.(N.S.) 760, 143 N. W. 764, that such provision did not have a retrospective effect so as to cut off appeals from all judgments entered more than six months prior to the taking effect of the statute, but simply meant appeals from these judgments would be governed by the old statute except the time for appeal could not be prolonged past six months from the date of the taking effect of the statute. In the case at bar the defendant had a little over five months left of his year when this new act went into effect, and he appealed within that time and within six months from the passage of the statute. The appeal was taken in time.

The motion to quash the indictment is based on the allegation that an unauthorized person was permitted to appear before the grand jury and to give information and advice.

The state's attorney appointed as his assistant, Mr. E. R. Sinkler of Minot, a citizen of the United States, a bona fide resident of this state and an attorney at law, duly admitted to practice in this state, and Mr. Sinkler qualified as such, though not a resident nor an elector of Williams county. It is urged he was not such a person as could be appointed assistant; and that the state's attorney has now no power or authority to appoint an assistant, but such appointment must be made by the county commissioners; and that in any event an assistant state's attorney may not appear before the grand jury under the provisions of our statute.

Heretofore we have had occasion to pass upon the point whether the attorney general and his assistants could appear before the grand jury in a prosecution and this court is committed to the rule that such officers may appear. See State v. Heaton, 56 N. D. 357, 217 N. W. 531; also State ex rel. Miller v. District Ct. 19 N. D. 819, 124 N. W. 417, Ann. Cas. 1912D, 935, and though there was no express amendment of § 10,666 of the Code the provisions of the new legislation were held to modify the expression "no other person is permitted to be present during their sessions, except the members, and a witness actually under examination." Therefore § 10,666 of the Code is not entitled to the strict construction demanded by the defendant.

Section 3380 of the Code authorizes the state's attorney to appoint

an assistant within his county, and, when he qualifies, by filing his oath of office, he "shall have the same power and perform any and all duties, now required of the state's attorney, etc." It is urged by the defendant that this section has been repealed by the provisions of § 2 of chapter 52 of the Session Laws of 1921. Section 5 of this chapter says all acts or parts of acts in conflict herewith are hereby repealed. Neither the title nor the body of the act makes specific reference to § 3380 of the Code as being amended or repealed. Repeals do not come by implication unless the provisions of the new statute are so contradictory and repugnant that the older provisions cannot stand with them. See Sargent County v. Sweetman, 29 N. D. 256, 150 N. W. 876, also 25 R. C. L. 914–922. The general policy of the law has always been to allow the duly elected official to appoint his own assistants and deputies. Chapter 52 of the Session Laws of 1921 did not take away specifically from the state's attorney the power granted in § 3380. It merely authorizes the county commissioners to appoint an assistant or clerk, and specify the salary for this assistant and clerk. It is additional, rather than substitutionary. Under § 3380 while the state's attorney may appoint an assistant, he does not bind the county to the payment of any salary. Section 3380 has not been repealed by the provisions of chapter 52 of the Sess. Laws 1921.

The next proposition is whether Mr. Sinkler was qualified to be appointed assistant state's attorney. In § 3380 nothing is said in regard to the qualifications of the assistant. Under the general tenor of that section he must be one who is competent to fulfil the duties; therefore he must be one who can appear in the courts and prosecute. Thus he must be an attorney at law duly admitted to practice in this state, and as such his qualifications would be the qualifications of an attorney, which would require him to be a resident of the state and a citizen of the United States, but with nothing said as to voting qualifications or residence. This § 3380 was on the statute books in 1895. There could have been no question, if the state's attorney had then appointed as assistant state's attorney a woman who was an attorney at law, and admitted to practice, but that the appointment would have been valid though she would not have been an elector. The statute does not say the assistant must have all the qualifications of the state's attorney. It does not specify what the required qualifications are.

Nothing is said as to residence. That assistants and deputies need not have the qualifications of the principal is evident from § 708 of the Compiled Laws which specifies the qualifications requiring only citizenship of the United States and residence in the state. In the absence of a statute requiring residence in the county as a prerequisite for appointment we need not read such qualification into the law. The defendant cites us to Ex parte Corliss, 16 N. D. 470, 114 N. W. 962. It is true that the syllabus of this case says "that neither his appointment as assistant state's attorney nor his employment by the board of county commissioners vested in him any right to visit such grand jury sessions." But we must read the opinion to see why such a statement is made. The court is referring to the appointments and the employments in that particular case. The opinion itself shows the court did not consider nor pass upon the question whatever, because such claimed rights had been withdrawn by the applicant himself. The applicant was applying to this court for a writ of habeas corpus and as foundation for his right to appear in the grand jury room was insisting that as deputy temperance commissioner he had such right. The case was brought to test the constitutionality of the law creating the office of temperance commissioner. At first, to bolster his position, the applicant claimed he had been appointed assistant state's attorney and also had been employed by the county commissioners to assist the state's attorney. However, at the hearing he frankly conceded that both this appointment and this employment had been sought and obtained because he had been employed by private individuals to prosecute certain cases, and so this court in the opinion says:

"It was not a good faith employment for the purpose of assisting the state's attorney in the discharge of his duties, but was, as conceded by him as above stated, for the purpose of gaining admission to the sessions of the grand jury for the purpose of discharging his duties. under such private employment." That the court is not passing upon these points is evident for the court says:

"Even if a good faith employment by the county commissioners would legally qualify him to visit the grand jury session, which we seriously question, we are clear that he had no such right under the employment in question, as he concedes, as before stated, that it was.

merely to enable him to fulfil a contract of employment entered into with private individuals."

The applicant therefore, when the case was argued in this court, withdrew all such claims and rested his case solely upon his position as deputy temperance commissioner. The court passed upon the rights and powers of this office. The whole case turned upon the constitutionality of the law creating the office. Therefore, we must read the syllabus in the light of what was really before the court. The concession of the applicant that he could not be appointed assistant state's attorney because he was a nonresident does not make the concession the law, nor does it make the case cited authority in the present case. We are satisfied the assistant state's attorney need not be an elector in the county nor a resident thereof.

The third proposition deals with whether the assistant state's attorney may appear before the grand jury. Section 3380 of the Code says he shall have the same power as the state's attorney. The state's attorney may appear before the grand jury, therefore the assistant may do so also. Paraphrasing the language of this court in State ex rel. Miller v. District Ct. 19 N. D. 819, 124 N. W. 417, Ann. Cas. 1912D, 935, we cannot believe the legislature of this state imposed so many duties upon the assistant state's attorney and then deprived him of the means of performing them.

This section of the Code gives the assistant the right to perform all duties of the state's attorney and one of his duties is to appear before the grand jury. This case is easily distinguishable from the case of State v. Johnson, 55 N. D. 437, 214 N. W. 39, for the gentleman who appeared before the grand jury in the latter case was neither the state's attorney, nor the appointed and qualified assistant, nor the attorney general or his assistant.

The next proposition deals with the general allegation of the insufficiency of the evidence to justify the verdict. In this connection we must consider the objections raised during the trial. These comprise some 303 of the alleged errors. We cannot go into an exhaustive analysis of all of them. The trial court is vested with a large discretion in the admission or rejection of evidence and many times rulings are made which though technically incorrect ultimately prove to be harmless. One hundred and seven allegations deal with the reception of

exhibits. Practically all of these exhibits were said to be the records of the bank of which the defendant was president. There is no dispute in the evidence but what the defendant was the president of the bank and one of the directors at the time of the receipt of the deposit described in the indictment. While not waiving any of the specifications of error the defendant bases his claim of insufficiency of the evidence on the general ground that the proof fails to show that on the 16th day of May, 1923, "the actual cash market value" of the assets of the bank "was insufficient to pay its liabilities." This necessitated a minute examination of the records of the bank, the assets and their value, the liabilities and their amount, what were in fact assets and liabilities, and the records and documents from which the same could be proved. The objections to the reception of the evidence took the form mainly of failure to properly identify them as records. It is negative rather than positive. There is no attempt to show positively that they are not the records. True, the state must prove they are the records, but having offered proof the objections are leveled against the quality of the proof offered rather than an attempt to prove independently that they are not the records. No one disputes that they are the records except so far as objection for lack of proof is concerned, so we confine ourselves merely to the determination of the evidence which is introduced to show that they are the records.

We have already enumerated the exhibits specifically attacked, and will briefly discuss them and a few others. Exhibit 12 is an unsigned general statement of the bank dated November 9, 1923. It contains some 82 pages showing loans and discounts, lists of first mortgage loans, footings and valuations, valuations of assets, etc. It is alleged that this is not the original but a carbon impression, that there is no proof showing who made it, for what purpose it was made, who made the valuations, why they were made, and that in any event it is too remote. Pages 42 to 72 of the exhibit purport to show all of the depositors of the bank and the nature and character of their deposits. It is claimed that there is no proof to show that this is correct or that it is in any way relevant to the issue; that it contains comments, and notations from unknown sources. When the exhibit was offered in evidence objection was made that there was "no foundation for its introduction, no foundation laid that it is a correct statement of the assets of the said bank, and not the best evidence." The

exhibit was prepared by and under the direction of one R. S. See, who testified showing his qualifications through long experience in banking matters, that the exhibits "contained a statement of the assets that came into" his possession as receiver, that it contained "a statement of the bills receivable that came" into his possession. There was foundation showing its preparation and accuracy. It did not purport to show the condition of the bank at the time the deposit was received. It was a summary of the condition of the bank at the time the witness as receiver turned over the assets to his successor. Exhibit 51 showed the condition when See took charge—at the time the bank closed—and See testified the two exhibits were practically identical except as to notes collected in the meantime. Then books of the bank were introduced to show the condition at the time of the deposit. Hence exhibits 51 and 12 were used as convenient statements to aid in the examination of the books and records, both being shown to be accurate. The objection that exhibit 12 had comments and marginal notations from unknown sources was not raised at the time of its introduction. The objection made was not sufficient to call such complaint to the attention of the court, hence the objection made was properly overruled.

Exhibit 51 purports to be a general statement of the resources and liabilities of the bank as of the date of June 11, 1923, and it is similar to exhibit 12 but of an earlier date. In addition to objections similar to those leveled against exhibit 12, it is now stated that the tendency of this exhibit was to inflame the jury because the exhibit showed a list of several hundred names of depositors of the bank, including churches and civic societies as well as individuals, and it "could have no effect other than to influence passion, prejudice and antipathy." Doubtless there was a good deal of irrelevant and immaterial matter in both of these exhibits. But such matter was not pointed out to the court and surely if there were any extraneous matter in either one which would have the tendency to inflame the jury, it would have been discovered at the time of the trial and would have been pointed out readily. Under proper objection the court would have disposed of such matter.

The thirteen exhibits described as 53b, 53c, 53d, 55a, 55b, 55d, 58a, 58b, 58c, 59c, 59d, 62B and 54 A are of a different character: Each

is separate and distinct and purports to show lists of notes with collateral held by various bodies such as the First National Bank of St. Paul, the War Finance Loan Company, etc. All were found with the other records of the bank and a comparison of them with these records shows the same notes, dates and parties, etc.

Exhibits 22 and 24 purport to be the minute books of the bank. There was testimony by witnesses Iverson, Barry and Blegen relative to these exhibits, much of which was of little value; but there was evidence to show that these so-called minute books were the books and papers and records of the bank, and were the minute books. They purport to be minute books and no one denies it. They were necessary to show the relationship of defendant to the bank, his presence at and participation in the meetings of the corporation, and his knowledge of the business and condition of the bank.

Exhibit 6 purports to be a general ledger covering a period from July 1, 1920 to February 1, 1923. The only objection is that it is not the best evidence, is incompetent, irrelevant and immaterial, and does not tend to prove any of the issues. Such books are required to be kept by the bank and penalties are prescribed for failure to keep books and records and to make reports. The general trend of the evidence for foundation may be stated thus: Immediately upon the bank closing a deputy state examiner took charge and took into his possession all of the books and records which he found in the bank; he kept them in his possession unchanged and turned them over to the employees of the receiver, and these books and records are the ones introduced in evidence. It is objected that these officers could not have any knowledge themselves "as to whether or not these books were actually the books of the bank and kept by it in the regular course of business."

The remaining exhibits attacked purport to be letters written to the Williams County State Bank and carbon copies of replies. These letters are directed over a wide area—to certificate holders, and banks and individuals, in Grand Forks, Fargo, and other cities in this state and in various towns and cities in Minnesota, Wisconsin, Iowa, Illinois, California and other states. These deal with business matters of the bank easily traceable and a comparison of the purported reply with the letter itself would indicate a connection between the two. The

defendant was the president of the bank at the time and the carbon copies have his initials in the lower lefthand corner, together with the initial of one who was a stenographer in the bank at the time and which fact is testified to by a witness. The replies have the word "President" written at the lower righthand with a place for his signature. It is significant that the defendant was on the stand and he does not deny that these copies were true and correct copies of letters which he wrote. He does not even attempt to raise a doubt regarding them, not even to the extent of -not recalling that any such letters were received or answers sent. True he is not required to do so but the question of sufficient foundation is one for the court to pass upon primarily. No request to caution the jury against considering these and other exhibits unless satisfied they were genuine was made. They certainly are important exhibits—extremely important. For instance, 11G, dated July 22, 1922, reads as follows:

"Central Trust Co.,
Mason City, Iowa.

"Gentlemen: Regarding your letter of July 20th with further reference to certificate of deposit issued by this bank of $1000 which we found necessary to return to you unpaid. If a ninety-day certificate for $1000 will be acceptable with you, we will be very glad to send you our draft for the interest. This will be dated so that you will not be the loser of interest through the lapse of time between the due date of the certificate which you now hold and the issuance of the renewal. I am sorry we do not feel in position to cut this in two as you suggested in your letter.

"Yours very truly,

"President."

"L. J. R. ; K."

It will be observed this letter is written prior to the time this deposit charged in the indictment was received, and would have a tendency to prove that the defendant, if he wrote this letter, knew the bank was in a precarious condition some ten months before the deposit was received. About a week before he apparently had written to the same company admitting it had presented a certificate of deposit for

payment and asked the company to accept a sixty or ninety day renewal, with a draft for the earned interest. There are numerous letters to the same effect all written before the reception of the deposit, but though they cover a long period prior to the reception of the deposit, the time which may be covered is largely in the discretion of the trial court. We cannot see that it was abused in this particular.

There are numerous letters asking for the payment of certificates of deposit, with apparent replies stating the bank was unable to make the payments. For example, exhibit 11T, dated January 6, 1922, from Dwight, North Dakota, is a letter inquiring about two C.D.'s for $1000 each, due October 15, 1921, which apparently had been sent to the bank. And exhibit 11U, dated January 10th, 1922, written apparently in answer says, among others things:

"We have your letter of January 6th with reference to the two certificates of deposit issued—and upon which we were not in position to pay.

"We are negotiating loans through the War Finance Corporation and had hoped to have been in position to meet these certificates prior to this date, etc."

This has the initials of the defendant in the lower lefthand corner and the word "President" in the lower right. Exhibit 11X dated March 7th, 1922, is a letter apparently from the same person to the bank inquiring about the same certificates, saying:

"These C.D.'s must now be paid as it is impossible to wait any longer. So please do not compel me to start proceedings to collect from you by force, etc."

Exhibit 11Y is a carbon copy of what appears to be an answer thereto having the initials of the defendant in the lower lefthand corner and a place for his signature in the right above the word "President." The answering letter says:

"For some reason or other we have not received the proceeds from either the second or third War Finance loan. If it will be satisfactory to you to let this matter run along until we do get a definite reply, either one way or the other, it will be a great accommodation to us."

Exhibit 11AS purports to be a letter dated March 25, 1922, from Los Angeles, California, to the bank, in which the writer says:

"I am sending you my certificate as it's due the 27 so please send me all as I need it."

And exhibit 11AT purports to be a carbon copy of the answer thereto with the defendant's initials at the lower left, a place for his signature and the word "President" in the lower righthand in which he says:

"We have your letter of March 25th with which you inclose your certificate of $595.50. We are now returning to you our renewal bearing date of March 27th and drawn for the same amount, also our draft of $17.86 covering interest to date of renewal.

"Our board of directors still believe that we should not pay certificates of this kind and we hope that by the maturity date of the one which is inclosed, we will be in position to send you draft should you so desire."

These are taken at random and are indicative of the nature of the correspondence, which all tends to show that no matter what was the actual cash value of the assets of the bank the bank could not meet its obligations in the due course of business, and that the defendant knew this for at least a year before the time of the taking of the deposit. · In addition there were copies of purported answers written by the defendant in answer to letters inquiring about the payment of deposits. For example, exhibit 11AG purports to be letters written by one Alfred Johnson inquiring about when his certificates can be paid. Exhibit 11AF purports to be the carbon copy of the answer. It is dated June 7, 1922 and addressed to Alfred Johnson, Grand Forks. It has the initials L.J.R. in the lower lefthand corner and a place for signature over the word "President." It states, among other things:

"I am glad to advise you that we believe that within the next few weeks we will be paying these certificates in amounts that people are in need of."

This is a sample of these exhibits. As we have remarked the defendant did not deny that these letters were received nor that he wrote these answers. He was on the stand; if it were not true he knew it; the objections thereto were very general; and in his own examination he made use of many of them, calling them as indicated, such as bank ledger, etc. Some of these very exhibits he identifies himself. For example, on page 133 of the transcript, objection was made to the introduction of exhibit 41 purporting to be a bunch of deposit slips for

January 15th to 31st, 1923, and the admission of the same is assigned as error No. 94. But on pages 1553 and 1554 of the transcript the defendant himself says that they are such slips and makes use of them in his testimony. Again in the strenuous attack on the testimony of witness John J. Murphy, it is alleged as error No. 53 the admission of exhibit 13H a letter from Mr. Murphy, and in the brief it is stated:

"There is no evidence that the letter ever reached Mr. Rodman, that he ever saw or read the letter, etc." (page 57, vol. 2, Brief) but on page 1594 of the transcript exhibit 13H is shown the defendant and he testifies:

"Q. And I ask you to examine exhibit 13H and ask you if you received that letter from John J. Murphy, an attorney here in Williston?

A. Your question is, did I receive it?

Q. Did you receive that?

A. Yes, sir.

Q. And you knew the circumstances of that letter?

A. Yes, sir.

Q. Demand was made upon you for the payment of those C.D.'s?

A. Yes, sir.

Q. And you did not pay them?

A. No, sir."

Assignments of errors No. 100 to No. 106 attack the action of the court in admitting exhibits 11A, 11L, 11M, 11H, 11J, 11P, which are letters received and answers sent, but on page 1600 of the transcript defendant admits getting the letters and sending the answers; and so with a host of other exhibits offered and received. An examination of the whole record leads one irresistibly to the conclusion that they are indeed the records of the bank.

It is undisputed the bank was closed and put in charge of the banking department. The official who had charge of the bank was on the stand and testified as to the records that came into his possession when he took charge of the bank. Many of the exhibits appear to be parts of correspondence which took place between the defendant and other

banks and concerns with which he was dealing for the purpose of getting money, extension of accounts, and other transactions in which the bank was interested. In a great many of these more or less elaborate examination was had to prove the signature of the defendant. From one exhibit another could be traced, and an identification conforming to the indications would be produced. The court would then pass upon the sufficiency of identification to show whether or not the exhibit would be permitted to go before the jury. We have examined this evidence quite carefully but we see no reversible error shown in regard to the introduction of these exhibits. Sometimes carbon copies were offered in lieu of originals. It was urged that these were not the best evidence, but it was quite clear the originals were not in the possession of the bank or of the state. From the record of the case it was evident they could not be secured. There was no indication that the carbon copy was not true and correct and that the originals had not been mailed. Answering letters would be found so that all in all under such a mass of correspondence and records the trial court was satisfied there was sufficient evidence to permit these exhibits to be introduced. We find no error there.

The testimony of witnesses Murphy, Van Sickle and Blegen is especially attacked. Witness Murphy is a lawyer living in Williston. He was asked in regard to certain certificates of deposit issued by the bank which were in his hands for collection on or about October 15, 1921. We have already quoted testimony of the defendant regarding this. Of course, this was quite a while before the date of the deposit involved in this case; nevertheless, if it would throw any light upon the insolvent condition of the bank during the period the record shows the defendant was the president and active manager of the bank, it would be of value to the jury in determining not only the question of insolvency but the question of the knowledge of the defendant. Some objection is raised to the relevancy of his testimony because it is said: "The evidence does not disclose why these certificates were not paid." There is no serious question as to the liability of the bank on these certificates. It is claimed "the transaction was too remote in point of time" and "that it could not and did not tend to prove or establish any of the issues in the case. And its only purpose was to prejudice and inflame the jury against the de-

fendant." The state had a right, in fact it was its duty, to prove the condition of the bank. Isolated cases here and there, or points of time unrelated to each other, might be very unsatisfactory; but where there is a continuous state of affairs for months and years all pointing to the same conclusion, the evidence would be relevant and therefore the period of two years prior to the debt mentioned in the objections would not be too remote. When traced continuously 'from the earliest date to a date subsequent to the date mentioned in the indictment there is a proper foundation for the reception of the evidence, and relevancy would be established.

The witness Van Sickle was subjected to considerable attack. He was the deputy receiver in charge. He testified as to the loans and discounts, collections made thereon, and security therefor. Naturally much of this was from the books of the bank and it is true that it was hearsay so far as he was concerned; but he had these books and records and had examined them and was stating simply what was therein. The defendant cannot complain that the books which were part of the records contain certain statements. The state had a right to rely upon these statements as true.

The witness Blegen was a stenographer and testified to the contents of the letters which he said he had written for the defendant. Of course, he testified from memory as to the contents of these letters, but the state did not have the letters in its possession nor could the state get these letters. This witness testified the defendant dictated to him statements "in substance that they could not pay the certificates of deposit." He wrote those letters, he said, and at the dictation of the defendant, and stated he recollected that these letters were sent out.

Many of the objections leveled against the questions asked and exhibits were extremely general in their terms. For example, when exhibit 4 was offered, the only objection made was that it was irrelevant and immaterial. This exhibit was a bond purported to have been given by the bank to the county of Williams in order to secure deposits. A good deal of testimony of witnesses was directed to an explanation of what an exhibit itself purported to be. Exhibits which are part of records of a bank cannot always speak for themselves, in the sense of showing exactly what they are intended for, so that the average juryman may tell from the exhibit itself just what its general purpose is.

For example, the witness Van Sickle was placed on the stand. He showed that he was district manager of closed banks for a certain district including this bank in question, and that he was appointed by Mr. Baird the general receiver. He showed his knowledge, experience, his business capacity, and otherwise a foundation was laid to show that he was an expert on matters of banking, examination of bank books, and such matters incident to the trial of this case. When exhibit 5 was offered he was asked: "What is the general purpose of this exhibit 5; what is it used for?" The objection was made that the record was the best evidence, if competent, but the question was asked for the purpose of showing that the exhibit was of the effect and character required for a daily balance ledger. It is true that on many of these objections as to what the exhibit itself showed the instrument would be the best evidence if competent, but where it is complex in its nature, there is no error in permitting the examination of it to show its use and place in the general scheme of things and in the nature of the case, especially when the exhibit afterward went to the jury.

In the trial of the case, and in the arguments before this court, a great deal was said as to the financial conditions and stress in Williams county during the last few months of the operation of the bank. A good deal of this was for the purpose of showing such unusual conditions as to make it extremely difficult to tell the actual cash value of the assets of the bank and to aid or weaken testimony relating thereto. We have a right to assume the jury would know this. The court in its charge stated to the jury:

"The notes owned by the bank on the 16th day of May, 1923, and listed as assets of the bank, are presumed to be worth the face thereof with accrued interest to that date. Some testimony has been offered by the state tending to show that such notes were not worth their face value and it is for the jury to say what each note was actually worth on the 16th of May, 1923, in determining the total value of the bank's assets."

The court then goes on to tell the jury in effect that the state must show to them beyond a reasonable doubt that the notes were worth less than their face value before the presumption of worth as stated had been rebutted. Again the court told the jury that:

"In determining the amount of the bank's assets the jury should

determine beyond reasonable doubt the cash market value of all of the property both real and personal owned by the bank on May 16, 1923 . . ." There was testimony introduced for the purpose of showing the value of some of these notes and a sufficient number of them were attacked to reduce the amount of the assets below the liabilities of the bank if the jury believed the testimony. The jury may well have found the state had proved beyond a reasonable doubt that the actual cash value of the assets was less than the liabilities—in fact an examination of the evidence shows it would be extremely difficult to arrive at any other reasonable conclusion. It is true that some time previous to the 16th day of May, 1923, the actual cash value of these assets may have been a good bit higher than it was on the 16th day of May, 1923, and it may also be a fact that a year or two later many of these same notes which were considered to be much below par in value on May 16, 1923, would increase in value because of improved financial conditions. But the state charged the insolvency of the bank as of a certain day and there is nothing to indicate but what the finding of the jury on the question of the assets was a fair and reasonable finding as of and for the date mentioned.

In this respect the court charged the jury, as bearing upon the quality of the testimony regarding the value of the assets on the date charged:

"Some testimony has been offered in this case tending to show an unusual financial condition in Williston and Williams county during the time testified to by the various witnesses. This testimony may be considered by you as bearing upon the value of the assets, that is the value of the notes held by the bank, and bearing upon the ability of the makers to pay the same in the usual and customary manner, and also as bearing upon the question of the ability of the bank to meet the demands of its creditors in the usual and customary manner, and also as bearing upon the knowledge of the defendant as to the solvency or insolvency of the bank on the 16th day of May, 1923. Should the jury find that the bank was actually insolvent on the 16th day of May, 1923, and also find all the other material allegations of the indictment to be true, then it is immaterial what circumstances or financial condition caused it, and it would be your duty to find the defendant guilty."

Following this the court said:

"Some testimony has been offered tending to show the value of the notes owned by the bank, and some of this testimony related to a time after the 16th day of May, 1923. I charge you that this testimony can be considered by you only as bearing on the value of the paper on the 16th day of May, 1923, as the value at any later date is immaterial, and should not be considered by the jury except as the same may throw light on the value as of May 16, 1923. The weight of such testimony is for the jury, but I charge you that any testimony which may have been offered showing the circumstances of the maker of the paper or the value of the paper at any considerable time after the 16th day of May, 1923, should not be considered by the jury for any purpose."

The court was giving both the state and defendant an opportunity to prove the "actual" cash value of the assets and safeguarded the rights of the defendant in protecting the value from forced sale under unusual circumstances.

The state was required to prove not only the insolvency of the bank on the date stated but that the defendant knew the bank was insolvent. For this purpose much testimony was introduced showing the relationship of the defendant to the bank; his knowledge of the assets; the letters he wrote himself to others in an attempt to keep the bank open, and to protect the depositors, frantic efforts made here and there to secure loans and extensions; the turning and twisting in order to prevent the closing of the bank. All of this was competent to show the defendant's relationship to the bank and his knowledge of the condition. An official may with a laudable intent try to keep his bank open even though at that time and for some time past it has been apparent to him the bank is insolvent when tested by the rules laid down by statute, and that such condition may continue for an indefinite time. It is the motive which governs his actions, and this might readily appeal to the discretion of the court in case the defendant was found guilty. What we are concerned with however, in this respect is the quantity and quality of the proof tending to show his knowledge of actual conditions, and thus the motive is of no avail. It is quite apparent from the record the defendant was in actual charge, thoroughly acquainted with the condition of the bank and knew at that time and had known for some time, that the bank was insolvent. The record

is ample to sustain the charge not only of the actual insolvency of the bank but also the knowledge of the defendant with reference thereto.

It is urged that some of the testimony introduced and part of the examination of witnesses with reference to certain exhibits tended to prove the commission of other and independent crimes, such as deceiving the examiner, making false reports, receiving deposits other than the one described in the indictment, etc. Objections to testimony on the ground that it tended to prove the commission of other offenses were raised against the admission of certain deposit slips for the months of November and December in 1922 and January to June, inclusive of 1923, with specific testimony relating to the deposits on March 5th and April 21, 1923. It is claimed "the effect of this testimony was to establish the commission of other offenses and in addition there was no foundation laid." It is said: "The testimony was not responsive to any of the issues and too remote." These were part of the records of the bank and they include exhibits numbered from 30 to 48. Each exhibit is a bunch of slips in itself and evidently the purpose of introducing was to show that it was a common practice to receive deposits when the bank was insolvent; that therefore the one mentioned in the indictment was not an oversight but was simply a part of the same system. It is a well-settled rule, adhered to by this court in many cases, that because testimony may tend to prove the commission of collateral crimes it is not to be rejected on that score alone. The question at issue is its relevancy to the case at bar. If found to be relevant then the fact it may tend to prove other crimes is immaterial. As stated in the case of State v. Heaton, 56 N. D. 357, 217 N. W. 531:

"Relevancy is, in the main, the test of the admissibility of evidence, and if evidence is relevant to the issue on trial it is admissible unless shown to be subject to some rule of exclusion."

This is the rule laid down by this court in numerous cases, many of which are listed in the case cited. It is unnecessary for us to elaborate further on the feature as it is treated exhaustively in the Heaton Case. The state had a right to show that book value of assets was intentionally inflated as bearing on the knowledge of insolvency. The evidence introduced was relevant to the issue here, hence there was no error in its admission.

There are eight allegations of error which relate to the instructions

given to the jury. Two of these refer to the definition of insolvency. The court in its charge says:

"Our law provides that a bank shall be deemed insolvent, (a) when the actual cash market value of its assets is insufficient to pay its liabilities, or (b) when it is unable to meet the demands of its creditors in the usual and customary manner. This law means that a bank is insolvent when either one of these two conditions exists. Therefore, testimony has been offered in this case by the state tending to prove that the actual cash market value of the bank's assets was insufficient to pay the liabilities on May 16, 1923, and also the state has offered testimony tending to prove that the bank was unable to meet the demands of its creditors in the usual and customary manner on May 16, 1923. If the state has proven either of these it is sufficient so far as the question of insolvency is concerned but it must prove one of these at least before you can find the defendant guilty. With respect to the actual cash market value of the assets I charge you that a reasonable time must be allowed to realize thereon, in the usual and ordinary course of banking business, and what is a reasonable time, in determining the value of the assets on May 16, 1923, is for the jury to determine under all the evidence. The phrase, in the usual and customary manner means not by force and involuntary sale, but rather it means an ability to pay depositors, as banks usually do, and meet all liabilities as they become due to the ordinary course of business."

In another portion of the charge the court said:

"With respect to the law that a bank is insolvent when it is unable to meet the demands of its creditors in the usual and customary manner, I charge you that it was the duty of the Williams County State Bank to pay its certificates of deposit on demand at any time after they were due. Should the jury find that the bank did fail to pay its certificates of deposit on demand after they were due, is not proof that the bank was insolvent. It is merely evidence for the jury to consider in determining whether the bank was unable to meet the demands of these certificate holders in the usual and customary manner on May 16, 1923."

The defendant says this is an erroneous definition. He says the court quoted from § 5189 and failed to distinguish between the two classes of insolvency quoted. § 5189 says:

"A bank shall be deemed insolvent:

"1. When the actual cash market value of its assets is insufficient to pay its liabilities.

"2. When it is unable to meet the demands of its creditors in the usual and customary manner.

"3. When it shall fail to make good its reserve as required by law.

"4. When it shall fail to comply with any lawful order of the state banking board within any time specified therein."

The first two subdivisions are the ones involved here. The defendant says subdivision 1 defines actual insolvency whereas subdivision 2 is constructive insolvency; that what the law is concerned with is actual insolvency and that a bank might be "unable to meet the demands of its creditors in the usual and customary manner" and yet not be actually insolvent. In support of this contention he cites the case of State v. Syverson, 39 S. D. 638, 166 N. W. 157. In this case cited the supreme court of South Dakota bases its definition upon a statute identical with the ·first three subdivisions of § 5189 and gives it the construction claimed by the defendant. An examination of the authorities discloses some differences in construction and definition of the term insolvency and yet an analysis will show that in most of the cases the differences are more apparent than real.

In 16 Am. & Eng. Enc. Law, 636, 637, the term "insolvency" as applied to persons engaged in commercial pursuits is defined as:

"The condition of a person who is unable to pay his debts as they become due in the ordinary course of business," and "according to this definition a person may be insolvent though he has assets exceeding in value the amount of all his liabilities. In the popular and general sense the term 'insolvency' denotes insufficiency of the entire property and assets of an individual to pay his debts."

See also 22 Cyc. 1256, 14 R. C. L. 628. This is the definition adopted by the United States Supreme Court in Toof v. Martin, 13 Wall. 40, 20 L. ed. 481, and followed and approved in Buchanan v. Smith, 16 Wall. 277, 21 L. ed. 280; Wager v. Hall, 16 Wall. 584, 21 L. ed. 504; Cunningham v. Norton, 125 U. S. 77, 31 L. ed. 624, 8 Sup. Ct. Rep. 804; Magee, Banks, 3d ed. 603; 1 Michie, Banks, 496; 2 Morse, Banks, 5th ed. 302.

In Thompson v. Thompson, 4 Cush. 127, 134, we find the term

defined as "Inability to pay in the ordinary course, as persons carrying on trade usually do."

See also State v. Cadwell, 79 Iowa, 449, 44 N. W. 700; Bloomfield Woolen Mills v. Allender, 101 Iowa, 181, 70 N. W. 116; State v. Boomer, 103 Iowa, 106, 72 N. W. 426 at page 427.

The same court in State v. Kiefer, 183 Iowa, 319, 163 N. W. 698, says:

"To prove the firm insolvent it was not necessary to show that its entire propery was insufficient to meet its obligations, but that the said firm in the operation of its bank was not in a condition financially to pay its debts as these matured in the usual and ordinary course of business."

In this they affirmed the case of State v. Cadwell and State v. Boomer, supra. In fact insolvency does not depend upon the fact that ultimately the bank may pay out. See Toovey v. Ayrhart, 136 Iowa, 694, 114 N. W. 181.

The supreme court of South Dakota, in an earlier case and under a statute somewhat different from the one involved in the Syverson Case, adopts this definition. State v. Stevens, 16 S. D. 309, 92 N. W. 420, was a case where the cashier of a bank was prosecuted for receiving deposits when he knew the bank to be insolvent, as defined by the Compiled Laws of South Dakota, § 6850, and the court says that:

Under such law "punishing the receipt of a deposit by a bank officer when the bank is insolvent and the officer knows of such insolvency, the term 'insolvency' means a present inability to pay depositors as banks usually do, and meet all liabilities as they become due in the ordinary course of business."

Section 6850 of the Compiled Laws of South Dakota provides that:

"No bank . . . shall receive . . . any such deposits as aforesaid when insolvent. Any officer . . . knowing of such insolvency who shall knowingly receive or accept . . . any such deposit . . . shall be guilty etc."

There is another class which appears to adopt a slightly different definition, holding that:

"A bank is 'insolvent' . . . when its property and assets are of such character and value that it cannot meet its demands in the ordinary course of its business."

See Parrish v. Com. 136 Ky. 77, 123 S. W. 339; State v. Cramer, 20 Idaho, 639, 119 Pac. 30.

Then there is another line of authorities which seem, at first, to take vigorous issue with these definitions. The rule set forth in Cadwell v. State, supra, is disapproved in the case of Fleming v. State, 62 Tex. Crim. Rep. 653, 139 S. W. 598; Griffin v. State, 142 Ga. 643, L.R.A. 1915C, 716, 83 S. E. 543, Ann. Cas. 1916C, 80, and Ellis v. State, 138 Wis. 513, 20 L.R.A.(N.S.) 444, 131 Am. St. Rep. 1022, 119 N. W. 1110. See also People v. Clark, 329 Ill. 104, 160 N. E. 233. These authorities seem to assume that the definition given with reference to "inability to meet the demands of its creditors in the usual and customary manner" means a case where there would be a sudden run on a bank, which is an unusual occurrence, or where all depositors having accounts subject to check would come in and demand their money at the same time. Of course, these definitions do not intimate any such condition, for that would not be meeting the demands of creditors "in the usual and customary manner." Evidently the supreme court of Washington had in view the right of a bank under these abnormal unusual conditions to claim to be solvent if such obligations could be met within a reasonable time. In Dunlap v. Seattle Nat. Bank, 93 Wash. 568, 161 Pac. 364, the court says:

"A bak is not 'insolvent' if its assets are sufficient to meet its obligations within a reasonable time, although it did not have cash sufficient for its daily needs."

In the case of Ellis v. State, supra, the Wisconsin court seem to have in mind the sudden and abnormal demands.

In State v. Hightower, 187 N. C. 300, 121 S. E. 622, it is said:

"The inability to meet depositary liabilities as they become due in the regular course of business, with knowledge thereof, is a point fixed by the statute beyond which the proprietors of a bank may not continue to receive deposits therein with safety to themselves. This does not mean that the officers of a bank may not persist prudently and wisely in an effort to avert a financial disaster, or to tide over a temporary embarrassment, such as may arise in a time of money stringency, but it does mean that criminality will attach under the statute when any such officer or employee receives, or when any such officer permits an employee to receive, deposits therein with knowledge

of the fact that, by reason of the bank's insolvency, such deposits then being received, are taken at the expense or certain hazard of the depositors presently making them."

After discussing the evils of the "premature or unnecessary suspension" the court goes on to say: "To require a bank to close its doors, because of inability to pay depositors on demand, and not 'as they become due in the regular course of business' or as a matter of right, would make the fabled position of doubly unfortunate peril most real . . ."

The court then quoted Ellis v. State, supra. In the case at bar the court did not charge that a bank was insolvent if it could not pay its depositors on demand. No bank could do this if all demanded at the same time, but it did charge that the bank was insolvent if it were unable to pay the demands of the depositors as these demands "became due in the regular course of business."

In the case of State v. Syverson, 39 S. D. 638, 166 N. W. 157, the supreme court of South Dakota makes no reference to the case of State v. Stevens, supra. When the case of State v. Stevens was decided South Dakota had a statute forbidding banks to accept or receive deposits when insolvent and made it a felony for an officer to so receive deposits knowing the bank insolvent. See §§ 871 and 872 of the Compiled Laws of 1903. It is true there is no definition of insolvency given and that by the time the case of State v. Syverson was decided there was a general banking statute in South Dakota governing state banks (chapter 223 of the Session Laws of 1909) and that this law, in § 46 of the act had the same definition for insolvency which our § 5189 sets forth in its subdivisions 1, 2 and 3. Nevertheless, the principles involved are the same, for the statutory definition is merely the common-sense definition.

Even had there been no definition given by our statute so far as the 1st and 2nd subdivisions of § 5189 are concerned, the court would be required to define the terms "insolvency" and "insolvent" in a prosecution under § 5176, and would have defined them just exactly as it did define them for such is the meaning of the terms. It is not the statutory definition which makes these terms; the statute has put into the law the ordinary acceptation when applied to financial institutions like banks. An examination of the authorities quoted shows no

real difference of opinion as to the definition. In the main they agree on this, that when a bank is unable to pay its depositors and creditors in the usual and customary manner required in the dealings between the bank and the depositor—not abnormal and panic conditions—so that the purpose and the function of the bank is destroyed, then that bank is insolvent so far as the public is concerned and the banker who receives money knowing, as stated in the case of State v. Hightower, supra, that the deposits are being received at the hazard of the depositor because the bank cannot then pay the ordinary checks coming in from ordinary business from day to day and cannot pay the certificates of deposit that are maturing, is taking deposits when he knows the bank is insolvent.

Hence, all of the authorities, when discussing insolvency from the standpoint of "inability to meet the demands of its creditors in the usual and customary manner" have in mind not sudden and violent fluctuations in demands but the ordinary and business procedure contemplated by banks when they are organized for business. This is what the court stated to the jury and the whole theory of the case, including the testimony produced, and the charge to the jury is based on the principle that solvency was not determined by sudden and extraordinary demands but by the usual and ordinary course. We believe the charge as given is correct.

The court instructed the jury that because it was necessary to prove insolvency "therefore, testimony has been offered in this case by the state tending to prove that the actual cash market value of the bank's assets was insufficient to pay its liabilities on May 16, 1923." This is alleged as error. The charge in the indictment is that the bank was insolvent on the 16th day of May, 1923. It became necessary, therefore, for the state to prove insolvency on that day. The state did introduce evidence tending to prove insolvency on that day as defined by subdivision 1, § 5189 of the Code. There was no error in this instruction. It is not an expression of opinion as to the weight of the evidence. It would require a hypercritical definition of the word "tend" to intimate that it was an expression of opinion on the part of the court.

The court charged the jury with reference to accommodation notes, saying:

"I charge you that an accommodation note is not to be considered by you as an asset to the bank, when made payable to the bank, that is, made for the accommodation of the bank, so long as it is in its possession. An accommodation note is one given without receiving value therefor. Therefore, if you find that there were accommodation notes listed among the assets of the bank and in its possession on May 16, 1923, you should not consider them as assets in determining whether or not the bank was insolvent on said date."

There was evidence introduced for the purpose of showing that among the assets listed were accommodation notes held by the bank, and made for the accommodation of the bank. Manifestly, these could not be assets of the bank. The bank could not recover on them if solvent, and even if they had been hypothecated and out of the possession of the bank they would be liabilities instead of assets, as the bank would be liable to the person who gave the accommodation in case collection was forced. Such accommodation notes should not be considered among the assets and so the instruction was correct.

The state offered testimony for the purpose of showing the defendant had gone through bankruptcy. With reference to this class of testimony the court said:

"Evidence has been offered tending to show that the defendant has taken bankruptcy. This testimony may be considered by the jury only as bearing upon the value of notes or other debts due and owing from the defendant to the bank on May 16, 1923, should you find there are any such."

The evidence shows that among the listed assets were accounts due from the defendant. In proving the actual cash value of the assets of the bank it became necessary for the state to prove certain listed notes and accounts were not worth their face value. In order to show the actual value of these accounts it was perfectly competent for the state to prove the makers had been discharged in bankruptcy from any obligation on them, and as defendant's accounts were among those so attacked, such proof applied to him. On page 1594 defendant himself admitted he was overdrawn and had given a note for $1200 to cover his debts. Thus the instruction was correct.

The court charged the jury it was necessary for the state to prove not only that the bank was insolvent on the 16th of May, 1923, but that

the defendant on that day knew it was insolvent, and in the definition of knowledge said: "To know a thing or have knowledge of it, is an impression of the mind, the state of being aware, and this may be acquired in numerous ways and from many sources. It is usually obtained from a variety of facts and circumstances. Generally speaking, when it is said a person has knowledge of a given condition it is meant that his relation to it, his association with it, his control over it and his direction to it, are such as to give him actual information concerning it." It is urged that this is an erroneous definition. We cannot see how the jury could be misled by that definition. Possibly it was not necessary to have gone into the definition so fully. It might be presumed that the jury was of average intelligence and would know what it meant to know a thing or to have knowledge of it. It is quite possible that a metaphysical discussion of "knowledge" would not add much to the practical view of knowledge the ordinary person would have, but we see no harm in this definition and no error has been shown. The court had charged the jury that the state had to prove insolvency as of May 16, 1923, and that the defendant on that date knew it was insolvent. These were essential facts in the crime charged and which the state was required to prove.

There are seven allegations of error relating to refusal of requested instructions. The defendant asked the court to instruct the jury as follows:

"Premature or unnecessary suspension of a bank is often the very worst thing that could happen to all concerned, and especially to those intended to be protected by the statute. It is necessary, therefore, for the officers of a bank to exercise some judgment in determining when deposits are no longer to be received therein because of probable or apparent inability to meet depositary liabilities as they become due in the regular course of business.

"When a banker stands face to face with the condition of probable or apparent inability to meet depositary liabilities as they become due in the regular course of business, he knows that to go into liquidation unless such be absolutely necessary, is inviting a greater disaster for both stockholders and depositors than to persist in going on.

"It is a matter of common knowledge that the years 1917 and 1918, when the United States was engaged in war, were years of great infla--

tion; that is, the money in circulation increased to an abnormal extent, and it is also a matter of common knowledge that the years 1919, 1920, 1921 and 1922 were years of deflation and liquidation. That is, the money which increased in such volume during the war, was withdrawn from circulation by the banks; thereby making a great scarcity of money with which to do business of the country, and thereby making it difficult for bankers to procure money to continue the ordinary business of banking. It is also a matter of common knowledge that the crops raised by the farmers of North Dakota mature in the fall and that the proceeds of the sale of such crops are not available for the payment of the farmers' indebtedness until they are harvested and threshed and sold in October, November and December, all of which you may take into consideration in connection with all the other evidence in the case.

"The laws of this state specifically provide that no receiver shall be appointed for a bank during such reasonable time as the state examiner may require for an examination of such bank. A state examiner may take possession and thereafter release such possession to the bank officials without the necessity of any receiver at all. The legislative idea and intent is plain and clear that there should not be a financial wrecking of banks in this state for a receivership is ordinarily a financial wrecking of a bank as an institution; all of which you may consider in determining the good faith of the defendant in any attempt to borrow money with which to do the ordinary and usual business of the bank during the period of stringency."

Instructions must be given or rejected as requested. See § 7620, Comp. Laws 1913. A reading of these instructions shows some are argumentative and others mere dissertations. There was no error in refusing to give them.

Another requested instruction was:

"It is a matter of common knowledge that liquidation of a bank in insolvency proceedings is usually attended with considerable loss and depreciation of the value of its assets, and you may and should consider such depreciation in determining whether the bank was insolvent on the 16th day of May, 1923."

The court had already stated to the jury—

In determining the actual cash value of the assets "that a reasonable

time must be allowed to realize thereon in the usual and ordinary course of banking business, and what is a reasonable time, in determining the value of the assets on May 16, 1923, is for the jury to determine under all the evidence. The phrase 'in the usual and customary manner' means not by forced and involuntary sale but rather it means an ability to pay depositors as banks usually do and meet all liabilities as they become due to (in) the ordinary course of business, . . . determine the reasonable cash market value of all property both real and personal owned by the bank on May 16, 1923."

The instruction asked the jury to consider the results of forced sale after insolvency in determining whether or not the bank was in fact insolvent. There was no error in refusing the instruction.

The defendant asked the court to instruct the jury:

"The inability to meet depositary liabilities, as they become due in the regular course of business, with knowledge thereof, is the point fixed by statute beyond which the proprietors of a bank may not continue to receive deposits therein with safety to themselves. This does not mean that the officers of a bank may not persist prudently and wisely in an effort to avert a financial disaster, or to tide over a temporary embarrassment such as might arise in a time of money stringency."

There was no error in refusing this instruction for the jury might get the impression that wise and prudent action justified violation of law.

Another request was:

"The statute permits a bank to loan out a large amount of its deposits and it would be unreasonable to say that it must be ready at all times to pay its entire depository liabilities on demand. Although the law undoubtedly contemplates that when a depositor places money in a bank as a general deposit he should have the right to withdraw it upon demand and that the refusal or inability of the bank to permit him so to do would be evidence of its failing condition, it is yet manifest that the mere fact that the bank does not have in its vaults sufficient cash to satisfy all its depositors or any considerable number of them on the same day, would not be proof of its insolvency. A bank might not be able to pay depositors on demand and yet be perfectly solvent."

Although the court had charged the jury that inability to meet the

demands of creditors in the usual and customary manner would be deemed insolvency, yet the court said, in another portion of the charge:

"Should the jury find that the bank did fail to pay its certificates of deposit on demand after they were due, (it) is not proof that the bank was insolvent. It is merely evidence for the jury to consider in determining whether the bank was unable to meet the demands of these certificate holders in the usual and customary manner on May 16, 1923."

The court had correctly charged the jury with reference to the legal effect of inability to meet demands but it would have been out of place for the court to say "the statute permits a bank to loan out a large amount of its deposits and it would be unreasonable to say that it must be ready at all times to pay its entire depository liabilities on demand."

It is not for the court to pass upon the reasonableness or unreasonableness of a statute when charging the jury. The court tells the jury what the law is and what is required of the jury.

No reversible error being shown, the judgment is affirmed.

Nuessle, Ch. J., and Birdzell and Christianson, JJ., and Wolfe, Dist. J., concur.

Burke, J., being disqualified, did not participate; Honorable Charles E. Wolfe, Judge of the Third Judicial District, sitting in his stead.